**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CEDAR RAPIDS DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | No. CR 04-0026-LRR |
| vs. | |
| LUIS ARMANDO VARELA-ARTEAGA, and TIFFANY MARIE CROSS, | **ORDER RE: DEFENDANTS' MOTIONS FOR JUDGMENT OF ACQUITTAL** |
| Defendants. | |

_____

TABLE OF CONTENTS

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.   PROCEDURAL BACKGROUND  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.  FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
      A.   Counts 1 and 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
      B.   Count 4  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

IV.   STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

V.    CONSPIRACY LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

VI.   LEGAL ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
      A.   Count 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
      B.   Count 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
      C.   Count 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

VII.  CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

## I. INTRODUCTION

The matters before the court are Defendant Luis Armando Varela-Arteaga's oral Motion for Judgment of Acquittal and his Memorandum re Motion for Judgment of Acquittal (docket no. 180) and Defendant Tiffany Marie Cross's Joinder to Memorandum re Motion for Judgment of Acquittal Pertaining to Count 4 (docket no. 182) and Motion for Judgment of Acquittal (docket no. 184).

## II. PROCEDURAL BACKGROUND

On July 14, 2004, a federal grand jury returned a fourteen-count Second Superseding Indictment against nine defendants. Defendant Luis Armando Varela-Arteaga ("Varela-Arteaga") was charged in Counts 1 through 8, 13 and 14. Defendant Tiffany Marie Cross ("Cross") was charged in Count 4. Varela-Arteaga entered a plea of guilty to Counts 7 and 14 pursuant to a plea agreement with the government that it would move the court to dismiss Counts 3, 5, 6, 8 and 13 following his sentencing.

Varela-Arteaga and Cross (the "defendants") proceeded to trial on Counts 1, 2 and 4. Count 1 charged Varela-Arteaga with conspiracy to engage in marriage fraud for the purpose of evading the immigration laws from between about 2000 and 2003. Count 4 similarly charged Varela-Arteaga and Cross with a separate conspiracy to engage in marriage fraud for the purpose of evading the immigration laws from between about 1996 and 2003. Count 2 charged on or about late 2000 and early 2001, Varela-Arteaga did knowingly and unlawfully aid and abet the entry into marriage of Laura Winter, a United States citizen, and Ruben Agundis-Ibarra, a foreign national, for the purposes of evading a provision of the immigration laws and seeking to obtain lawful immigration status in the United States.

The case was tried to a jury January 24, 2005, through January 27, 2005. Varela-Arteaga was personally present and represented by attorney John Lane. Cross was

2

personally present and represented by attorney Cory Goldensoph. Assistant United States Attorney Patrick Reinert represented the government. At the close of the government's case-in-chief, each defendant moved for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure ("Rule 29"). The court reserved ruling on each defendant's Motion for Judgment of Acquittal. At the conclusion of all the evidence, the defendants renewed their Motions for Judgment of Acquittal, and the court again reserved ruling on the Motions. On January 27, 2005, the jury returned verdicts of guilty on all counts. As to Count 1, the jury found: (1) Varela-Arteaga guilty; (2) Varela-Arteaga conspired with Laura Winter and Ruben Agundis-Ibarra; and (3) someone committed the six overt acts about which it was instructed in furtherance of the conspiracy. As to Count 2, the jury found Varela-Arteaga guilty. As to Varela-Arteaga with regards to Count 4, the jury found: (1) he is guilty; (2) he conspired with Martha Beatriz Varela, Cross, and Cecil Scott Becker; and (3) someone committed thirteen of the seventeen overt acts about which it was instructed in furtherance of the conspiracy. Also as to Cross with regards to Count 4, the jury found: (1) she is guilty; (2) she conspired with Martha Beatriz Varela, Varela-Arteaga, and Cecil Scott Becker; and (3) someone committed thirteen[1] of the seventeen overt acts about which it was instructed in furtherance of the conspiracy.

The court ordered the defendants to file post-trial briefs and motions within three weeks following receipt of the trial transcript by counsel, and within four weeks from the jury's verdict if no transcript was requested. On April 6, 2005, Varela-Arteaga timely filed his Memorandum re Motion for Judgment of Acquittal (docket no. 180) supplementing his renewed oral Rule 29 Motion. Cross timely filed her Joinder to

---

[1] The jury found the same thirteen overt acts as to Cross as it found as to Varela-Arteaga. The thirteen overt acts found to be committed by someone in furtherance of the conspiracy charged in Count 4 were c. [3.] and f. [6.] through q. [17.].

3

Memorandum re Motion for Judgment of Acquittal Pertaining to Count 4 (docket no. 182) on April 6, 2005, and her Motion for Judgment of Acquittal (docket no. 184) on April 7, 2005. On April 28, 2005, the government filed its Resistance to Defendants' Motions for Judgment of Acquittal (docket no. 196). The court therefore finds the defendants' Motions fully submitted and ready for decision.

### III.  FACTUAL BACKGROUND

After reviewing the record, the court finds the government offered at trial evidence proving the following:

During the time period in which the charged offenses occurred, Varela-Arteaga and Jose de Jesus Ibarra-Castaneda ("Ibarra-Castaneda") had joint ownership of at least five incorporated business organizations operating three restaurants in Cedar Rapids, Iowa, and one restaurant in Waterloo, Iowa.

Jose Burgos ("Burgos"), frequent customer and occasional employee of Varela-Arteaga's restaurants, testified that he had spoken with Varela-Arteaga on more than one occassion, and heard Varela-Arteaga speak, regarding illegal aliens adjusting their immigration status to remain legally in the United States. Burgos testified that he had conversations with Varela-Arteaga about which employees of the restaurants were United States citizens and single and could be married so that an illegal alien could adjust his or her immigration status. Burgos further testified that he had conversations with Varela-Arteaga and Ibarra-Castaneda about changes in federal immigration legislation making it easier for an illegal alien to marry a United States citizen and alter his or her immigration status.

### A.  Counts 1 and 2

Laura Winter ("Winter"), also known as "Laura Hahne," was an employee of one of Varela-Arteaga's restaurants, Hacienda Las Glorias restaurant in Waterloo (the

4

"Waterloo Hacienda"), from about April to October 2000.  At some point during her employment at the Waterloo Hacienda, Winter had a conversation with Varela-Arteaga about the possibility of her marrying one of his employees so the employee could adjust his immigration status.  Varela-Arteaga told Winter she would be paid $4,000 if she would do so.  She would receive half of the agreed-upon fee prior to the marriage, and the other half after the wedding occurred.  At a later time, after she no longer worked at the Waterloo Hacienda, Varela-Arteaga asked Winter if she would agree to marry one of his employees so the employee could adjust his immigration status, and Winter agreed to do so.  Winter testified that she was having legal and financial problems at this time.

Approximately one or two months after the conversations between Varela-Arteaga and Winter, Winter was introduced to Ruben Agundis-Ibarra ("Agundis"), also known as "Ruben Agundis."  Agundis was employed at a Hacienda Las Glorias restaurant in Cedar Rapids, Iowa (a "Cedar Rapids Hacienda").  Winter testified Ibarra-Castaneda took Agundis to the Waterloo Hacienda to meet Winter.  Agundis and Winter were married in a civil ceremony on March 29, 2001.  Gov't Ex. 49.

In exchange for marrying Agundis, Winter received the $4,000 in $2,000 increments as she and Varela-Arteaga had discussed.  Part of this payment is reflected in an April 26, 2001 cash deposit to Winter's bank account.  Gov't Ex. 51.  Winter testified Varela-Arteaga personally gave Winter both installments of payment, paying her the second installment at a Cedar Rapids Hacienda while she and her mother were dining there.  Agundis testified he borrowed the $4,000 from Varela-Arteaga and paid Winter himself.  Agundis testified he was to repay the loan from the money he earned by working for Varela-Arteaga.

Winter never dated Agundis and never had a sexual relationship with him.

5

Agundis never formally proposed marriage to Winter; instead she described their marriage as "set up and arranged." Tr. at 17. Winter testified that the only night they ever spent together was their wedding night. Winter further testified that she had no contact with Agundis during their first year of marriage. Agundis testified that he married Winter solely for the purpose of adjusting his immigration status. The dissolution of the marriage between Agundis and Winter was finalized in January 2004.

### B.  Count 4

Varela-Arteaga married Martha Beatriz Varela ("Beatriz Varela"), also known as "Beatriz Ibarra" and "Betty," in Mexico in October 1987. Gov't Ex. 15F, 52. Beatriz Varela is the sister of Ibarra-Castaneda. Three children were born of this marriage. The marriage was dissolved in August 1994 by a divorce decree issued in Mexico. Gov't Ex. 15G, 53. During the mid-1990s, Varela-Arteaga unlawfully entered the United States. Beatriz Varela also entered the United States.

In or about August 1996, Cross was employed by a Cedar Rapids Hacienda located on First Avenue. She lived in a house at 109 Seventh Street rented by her sister, which was across the street from the Cedar Rapids Hacienda on First Avenue. Cross occupied the attic of the house with her boyfriend, Cecil Scott Becker ("Becker"). Becker also worked at the Cedar Rapids Hacienda on First Avenue.

Cross called Christy Rasmussen ("Rasmussen") to testify at trial. Rasmussen testified that she witnessed a legitimate romantic relationship begin in 1996 between Varela-Arteaga and Cross. Witnesses testified at trial, however, that it was generally known among the restaurant's staff that Cross was dating and living with Becker.

On approximately November 12, 1996, in Carroll County, Arkansas, Varela-Arteaga married Cross. Gov't Ex. 15. This was approximately three months after beginning her employment at a Cedar Rapids Hacienda. Rasmussen was "shocked" at

how quickly Cross and Varela-Arteaga married after they began their romantic involvement. Tr. at 305.

On December 3, 1996, immigration authorities raided a Hacienda Las Glorias restaurant. A number of individuals, including Varela-Arteaga and Beatriz Varela, were arrested. Varela-Arteaga departed the United States voluntarily and returned to Mexico.

On December 10, 1996, approximately one week after the raid, Becker married Beatriz Varela (under the name Martha Beatriz Ibarra) in Carroll County, Arkansas. Gov't Ex. 15E. This is the same Arkansas county where Cross and Varela-Arteaga were married approximately one month earlier. On December 23, 1996, Becker and Beatriz Varela executed and filed four documents with the U.S. Department of Justice Immigration and Naturalization Service (the "INS"): (1) Becker's Petition for Alien Relative; (2) Becker's and Beatriz Varela's Biographical Information, claiming to live together at "2053 N. Town Ln #10, Cedar Rapids IA"; and (3) Beatriz Varela's Application to Register Permanent Residence or Adjust Status. Gov't Ex. 30A-30D. Their application and petition were denied on April 19, 2000, because neither Becker nor Beatriz Varela attended an appointment scheduled with Thomas Sankey, District Adjudications Officer for the United States Citizenship and Immigration Service (formerly the INS).

Rasmussen testifed that the relationship between Cross and Varela-Arteaga began to deteriorate in early 1997. On March 27, 1997, Cross and Varela-Arteaga executed and filed four documents with the INS: (1) Cross's Petition for Alien Relative; (2) Cross's and Varela-Arteaga's Biographical Information, claiming to live together at "109 7th St. S.W., Cedar Rapids, IA"; and (3) Varela-Arteaga's Application to Register Permanent Residence or Adjust Status. Gov't Ex. 29A-29D.

Varela-Arteaga returned to Cedar Rapids in April or May, 1997, just after he obtained work authorization based on his petition to adjust his immigration status.

Cross testified that she and Varela-Arteaga moved into their own apartment together at 1554 Mount Vernon Road in the summer or fall of 1997. Rasmussen testified that Cross and Varela-Arteaga lived together in an apartment on Mount Vernon Road. From January 1998, until August 2000, Varela-Arteaga rented the house at 1071 F Avenue NW, Cedar Rapids, Iowa. Cross testified that, as problems developed in her marriage to Varela-Arteaga, she moved between the Mount Vernon Road apartment, her mother's home, and Varela-Arteaga's rental house on F Avenue.

For 1998, Varela-Arteaga and Cross filed a joint U.S. Individual Income Tax Return indicating they resided at "1071 F AVE NW, CEDAR RAPIDS, IA." Gov't Ex. 26. The address on both Varela-Arteaga's W-2 and Cross's W-2 for work done in Cedar Rapids was the Mount Vernon Road apartment. However, three W-2s for Cross give an address in Tempe, Arizona. For 1999, Varela-Arteaga and Cross filed a joint U.S. Individual Income Tax Return indicating they resided at "1071 F AVE NW, CEDAR RAPIDS, IA." Gov't Ex. 1. The W-2 attached to the 1999 Return indicates Cross's only employment was at a Cedar Rapids Hacienda, and she resided at "1554 MT. VERNON RD SE, CEDAR RAPIDS, IA 52403," but she made less than $400. Evidence proved, however, Cross lived in Arizona during nearly all of 1999. Cross testified that she moved to Arizona in late 1998 or early 1999. Rasmussen testified Cross lived in Arizona for six years, returning to the Cedar Rapids area in May or June of 2004. Bradley Harrelson ("Harrelson") testified that he had a legitimate romantic relationship with Cross while she lived in Arizona, beginning in 1999. She gave birth to their son on November 13, 1999, and Cross and their son moved in with Harrelson once discharged from the hospital. Harrelson testified, however, that Cross remained

8

in contact with Varela-Arteaga via telephone, and that approximately six months after the birth of her son she returned to Cedar Rapids.

At some point after Varela-Arteaga took possession of the rental house at 1071 F Avenue NW, Cedar Rapids, Iowa, in January 1998, Beatriz Varela and their three children began to reside with him. Jim Hanson ("Hanson"), the F Avenue rental house's owner, identified Beatriz Varela in a photograph by her nickname "Betty" as the woman who lived with Varela-Arteaga at the F Avenue rental house. Hanson did not recognize Cross at trial. Sometime before April 3, 2000, Varela-Arteaga asked Hanson to provide a letter attesting to Varela-Arteaga's residence for immigration purposes. For purposes of the letter, Varela-Arteaga told Hanson that "Betty's" true name was "Tiffani" [sic], so that is the name Hanson used. Gov't Ex. 29E.

In April 2000, Varela-Arteaga paid Cross's traveling expenses for her return to the Cedar Rapids area from Arizona to join him in attending a meeting with an INS Officer. During the interview with the INS Officer concerning her marriage to Varela-Arteaga, Cross did not tell the INS Officer she was living in Arizona with Harrelson, a man with whom she had two children while married to Varela-Arteaga. On April 26, 2000, the INS District Director stamped Varela-Arteaga's Application to Register Permanent Residence or Adjust Status "APPROVED."

Three months later, on July 17, 2000, a Decree of Dissolution of Marriage was issued, dissolving the marriage of Cross and Varela-Arteaga. Gov't Ex. 15A, 15B. In August 2000 Varela-Arteaga closed on a newly-constructed house located at 4314 Roxbury Drive NW, Cedar Rapids, Iowa. For 2000, the defendants did not file a joint U.S. Individual Income Tax Return, and Varela-Arteaga's return indicated he resided at "4314 ROXBURY DR NW, CEDAR RAPIDS, IA." Gov't Ex. 2. From approximately August 2000 through 2003, Varela-Arteaga and Beatriz Varela resided

9

together at 4314 Roxbury Drive NW, Cedar Rapids, Iowa, with their children.

On August 23, 2002, Becker and Beatriz Varela filed a Joint Petition for Summary Decree of Divorce in Clark County, Nevada. Gov't Ex. 15E. On August 23, 2002, Becker and Beatriz Varela were issued a divorce decree. Gov't Ex. 15D. Both the Petition and Decree list Beatriz Varela's address as 4314 Roxbury Drive NW, Cedar Rapids, Iowa.

On December 3, 2002, Varela-Arteaga and Beatriz Varela were legally remarried in Linn County, Iowa. Gov't Ex. 15C. For 2002, Varela-Arteaga and Beatriz Varela filed a joint U.S. Individual Income Tax Return indicating they resided at "4314 ROXBURY DR NW, CEDAR RAPIDS, IA." Gov't Ex. 4.

## IV. STANDARD OF REVIEW

Rule 29 provides, in pertinent part, as follows:

> [T]he court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction. The court may on its own consider whether the evidence is insufficient to sustain a conviction.

Fed. R. Crim. P. 29(a). If the court reserves ruling on a motion made pursuant to Rule 29 and permits the jury to reach a verdict in the case, following a jury's verdict of guilty the court must decide the motion on the basis of the evidence admitted against the defendant at the time the court reserved ruling. Fed. R. Crim. P. 29(b). A defendant may also renew a Rule 29 motion following conviction. Fed. R. Crim. P. 29(c). However, it is well-settled that "[j]ury verdicts are not lightly overturned." *United States v. Hood,* 51 F.3d 128, 129 (8th Cir. 1995) (citing *United States v. Burks*, 934 F.2d 148, 151 (8th Cir. 1991)). A judgment of acquittal should only be granted "if there is no interpretation of the evidence that would allow a reasonable jury to find the

Case 1:04-cr-00026-LRR-CJW    Document 204    Filed 05/16/05    Page 10 of 24

defendant guilty beyond a reasonable doubt." *United States v. Gomez*, 165 F.3d 650, 654 (8th Cir. 1999).

In determining whether to grant a motion for judgment of acquittal based on the sufficiency of the evidence, the court may neither weigh the evidence nor evaluate the credibility of witnesses, as these tasks lie exclusively within the province of the jury. *United States v. Ireland*, 62 F.3d 227, 230 (8th Cir. 1995). Instead the court must "view the evidence in the light most favorable to the jury's verdict, giving the government the benefit of every reasonable inference and resolving all evidentiary conflicts in favor of the government." *Gomez*, 109 F.3d at 654. The court "can overturn the jury's verdict only if 'a reasonable fact finder must have entertained a reasonable doubt about the government's proof' of one of the offense's essential elements." *United States v. Kinshaw,* 71 F.3d 268, 271 (8th Cir. 1995) (quoting *United States v. Nunn*, 940 F.2d 1128, 1131 (8th Cir. 1991)). Moreover, "[t]his standard applies even when the conviction rests entirely on circumstantial evidence." *United States v. Davis,* 103 F.3d 660, 667 (8th Cir. 1996).

## V. CONSPIRACY LAW

In order to convict a person of conspiracy, "the government must show that the defendant entered into an agreement with at least one other person, the objective of which was unlawful, and that one of those in agreement committed an overt act in furtherance of the conspiracy." *United States v. Pardue*, 983 F.2d 835, 842 (8th Cir. 1993). The government only needs to prove one of the conspirators committed a single overt act in furtherance of the conspiracy, and such overt act does not need to be a crime. *United States v. Hermes*, 847 F.2d 493, 495-96 (8th Cir. 1988). Furthermore, "once a conspiracy has been established, only slight evidence is needed to link a defendant to the conspiracy." *United States v. Mickelson*, 378 F.3d 810, 820 (8th Cir.

2004). A defendant's participation in a single act may demonstrate membership in a conspiracy if the act justifies an inference the defendant has knowledge of the broader conspiracy. *Id.* at 820-21. "Because the details of a conspiracy often are shrouded in secrecy, circumstantial evidence and inferences from the parties' actions may be used to establish the conspiracy's existence." *Id.* at 821 (citing *United States v. Sparks*, 949 F.2d 1023, 1027 (8th Cir. 1991)). Evidence of mere association with conspirators is not sufficient to convict a person, though such evidence is relevant in determining whether a conspiracy exists. *Id.*

In this case, the conspiracies involved marriage fraud. An individual commits marriage fraud if he or she knowingly enters into a marriage for the purpose of evading any provision of the immigration laws. 8 U.S.C. § 1325(c). Although the Eighth Circuit Court of Appeals has not directly addressed the issue, this court agrees with the determination that "marriage fraud may be committed by one party to the marriage, or a person who arranged the marriage, yet the other spouse may genuinely intend to marry." *United States v. Orellana-Blanco*, 294 F.3d 1143, 1151 (9th Cir. 2002) (quoting *United States v. Tagalicud*, 84 F.3d 1180 (9th Cir. 1996)) (internal quotation marks omitted); *see also United States v. Rashwan*, 328 F.3d 160, 164 (4th Cir. 2003) (ruling spouse's intent in entering the marriage is irrelevant because statute is intended to punish any *individual* who knowingly enters into a marriage for the purpose of evading a provision of the immigration laws); *United States v. Amadi*, 772 F.2d 908 (Table), 1985 WL 13613, *3 (6th Cir. August 15, 1985) (ruling the spouses' intent is irrelevant to determining whether the defendants concealed their own intent that the marriage had an unlawful purpose).

12

## VI. LEGAL ANALYSIS

The defendants move the court to grant their Motions for Judgment of Acquittal on all of the Counts of which they were convicted. Both defendants claim that insufficient evidence exists as a matter of law to support their convictions. In response, the government contends sufficient evidence was presented at trial to sustain the defendants' convictions.

### A. Count 1

The court instructed the jury that the crime of conspiracy to commit marriage fraud, as charged against Varela-Arteaga in Count 1, has four essential elements, which are:

*One*,     between about 2000 and 2003, two or more persons reached an agreement or came to an understanding to enter into marriage for the purpose of evading a provision of the immigration laws;

*Two*,     Varela-Arteaga voluntarily and intentionally joined in the agreement or understanding, either at the time it was first reached or at some later time while it was still in effect;

*Three*,     at the time Varela-Arteaga joined in the agreement or understanding, he knew the purpose of the agreement or understanding was to evade immigration laws; and

*Four*,     while the agreement or understanding was in effect, a person or persons who had joined in the agreement knowingly did one or more of the following acts:

    1.   During late 2000, Varela-Arteaga asked Winter, a United States citizen, to marry an employee working in one or more Hacienda restaurants, for the purpose of the employee obtaining lawful permanent resident status.

    2.   In approximately January 2001, Varela-Arteaga approached Winter to marry Agundis and offered Winter $4,000 in exchange for participating in the fraudulent

marriage.

    3.  Winter agreed with Varela-Arteaga to enter into a fraudulent marriage with Agundis in exchange of $4,000 in United States currency.

    4.  In March 2001, Winter received $2,000 in cash as partial payment for agreeing to participate in the fraudulent marriage to Agundis.

    5.  On March 29, 2001, Winter and Agundis were married in Cedar Rapids, Iowa.

    6.  In April 2001, Winter received an additional $2,000 in cash for her participation in the fraudulent marriage to Agundis.

    for the purpose of carrying out or carrying forward the agreement or understanding.

Final Jury Instr. No. 13; *see also* 8 U.S.C. § 1325(c); 18 U.S.C. § 371.  The court further instructed the jury that the crime of marriage fraud has three essential elements, which are:

    *One*,    a person knowingly entered into a marriage;

    *Two*,    the marriage was entered into for the purpose of evading any provision of the immigration laws; and

    *Three*,  the person knew or had reason to know of the relevant immigration laws.

Final Jury Instr. No. 14; *see also* 8 U.S.C. § 1325(c).

    Varela-Arteaga argues the government produced no evidence he conspired with

Ibarra-Castaneda,[2] Agundis or Winter. The government resists Varela-Arteaga's arguments, citing extensive evidence in the record. The government also argues that the court may not judge a witness's credibility; the court may only determine whether sufficient evidence exists in the record to sustain the verdict of guilty.

First, in his Memorandum re Motion for Judgment of Acquittal, Varela-Arteaga challenges the credibility of Winter's testimony at trial. The court cannot assess the credibility of a witness in deciding a motion pursuant to Rule 29. *Ireland*, 62 F.3d at 230. Viewing the evidence in the light most favorable to the jury's verdict, the court finds sufficient evidence was presented at trial to support a reasonable jury's determination Varela-Arteaga conspired with Agundis and Winter to engage in marriage fraud for the purpose of evading the immigration laws as charged in Count 1.

As discussed more extensively in Part V. *supra*, a defendant's participation in a single act may demonstrate membership in a conspiracy if the act justifies an inference the defendant has knowledge of the broader conspiracy. *Mickelson*, 378 F.3d at 820-21. The evidence presented at trial proves Varela-Arteaga conspired, that is he reached an agreement or understanding, with Winter and Agundis to enter into a marriage for the purpose of evading provisions of the immigration laws. Varela-Arteaga spoke with Winter on two occassions prior to her marriage to Agundis about marrying one of his employees so that the employee could adjust his immigration status. Winter testified that she entered into an agreement with Varela-Arteaga to marry Agundis in exchange for payment of $4,000, and understood Agundis wanted to marry her for the sole purpose of adjusting his immigration status. Agundis testified that he married Winter

---

[2] The jury did not find Varela-Arteaga conspired with Ibarra-Castaneda in committing the offense charged in Count 1. Therefore, the court will not address Varela-Arteaga's argument as it relates to Ibarra-Castaneda.

solely for the purpose of adjusting his immigration status. Winter testified Varela-Arteaga personally gave her both installments of the payment for entering into the marriage with Agundis. A reasonable jury could find beyond a reasonable doubt that Varela-Arteaga entered into an agreement or reached an understanding with Winter and Agundis for the purpose of evading the immigration laws.

Viewing the evidence in the light most favorable to the government, as the court must, a reasonable jury could find the evidence proved beyond a reasonable doubt Varela-Arteaga is guilty of Count 1. The court does not find that a reasonable fact finder must have had a reasonable doubt as to his guilt as to Count 1. Accordingly, the court will not overturn the jury's verdict as to Count 1 of the Second Superseding Indictment.

### B. Count 2

The court instructed the jury that the crime of marriage fraud, as charged against Varela-Arteaga in Count 2, has three essential elements, as set forth in Part VI.A. *supra*. Final Jury Instr. No. 14; *see also* 8 U.S.C. § 1325(c). The court further instructed the jury it could find Varela-Arteaga guilty of marriage fraud even if he personally did not do every act constituting the offense charged, if he aided and abetted the commission of marriage fraud. Final Jury Instr. No. 14; *see also* 8 U.S.C. § 1325(c); 18 U.S.C. § 2. In order to have aided and abetted the commission of marriage fraud as charged in Count 2, Varela-Arteaga must, before or at the time the crime was committed:

    (1)    have known that marriage fraud was being committed or going to be committed by Winter and Agundis;

    (2)    have knowingly acted in some way for the purpose of causing, encouraging, and/or aiding the commission of marriage fraud between Winter and Agundis;

16

(3)    have known that the marriage between Winter and Agundis was entered into for the purpose of evading any provision of the immigration laws; and

(4)    have known or had reason to know of the relevant immigration laws.

Final Jury Instr. No. 14; *see also* 8 U.S.C. § 1325(c); 18 U.S.C. § 2.

Varela-Arteaga argues (i) the government did not produce sufficient evidence that he aided and abetted the marriage between Winter and Agundis and (ii) Winter's and Agundis's testimonies were contradictory. The government resists Varela-Arteaga's arguments, citing extensive evidence in the record. The government also argues that the court may not judge the credibility of the witnesses' testimonies, and may only determine whether sufficient evidence exists in the record to sustain the verdict of guilty.

As discussed above, the court cannot assess the credibility of the witnesses in deciding a motion pursuant to Rule 29. *Ireland*, 62 F.3d at 230. Indeed, the court must view the evidence admitted at trial in the light most favorable to the verdict. Pursuant to this standard of review, the court finds sufficient evidence was presented at trial to support Varela-Arteaga's conviction on Count 2 because a reasonable jury could conclude he aided and abetted the marriage between Winter and Agundis. Winter testified Varela-Arteaga approached her and asked her to enter into a marriage with one of his employees. Varela-Arteaga offered her $4,000 to enter into such a fraudulent marriage. Winter testified that she was having legal and financial problems at the time she was approached by Varela-Arteaga. A reasonable jury could infer Winter entered into the marriage for the purpose of receiving the substantial $4,000 payment. It was Varela-Arteaga, both before and after Winter's wedding to Agundis, who paid her the two $2,000 payments discussed and agreed to by Varela-Arteaga and Winter. A

17

reasonable jury could find beyond a reasonable doubt that Varela-Arteaga aided and abetted the fraudulent marriage between Winter and Agundis.

Viewing the evidence in the light most favorable to the government, as the court must, a reasonable jury could find the evidence proved beyond a reasonable doubt Varela-Arteaga's guilt as to Count 2. The court does not find that a reasonable fact finder must have had a reasonable doubt as to Varela-Arteaga's guilt as to Count 2. Accordingly, the court will not overturn the jury's verdict as to Count 2 of the Second Superseding Indictment.

### C. Count 4

The court instructed the jury that the crime of conspiracy to commit marriage fraud, as charged against Varela-Arteaga and Cross in Count 4, has four essential elements, which are:

*One*,    between about 1996 and 2003, two or more persons reached an agreement or came to an understanding to enter into marriage for the purpose of evading a provision of the immigration laws;

*Two*,    the defendants voluntarily and intentionally joined in the agreement or understanding, either at the time it was first reached or at some later time while it was still in effect;

*Three*,    at the time each defendant joined in the agreement or understanding, he or she knew the purpose of the agreement or understanding was to evade immigration laws; and

*Four*,    while the agreement or understanding was in effect, a person or persons who had joined in the agreement knowingly did one or more of the following acts:

1. On or about August 26, 1994, a divorce petition was filed in Mexico seeking a divorce of Varela-Arteaga and Beatriz Varela.

2. During about 1996, Varela-Arteaga unlawfully entered

18

the United States and began working for Ibarra-Castaneda, brother of Beatriz Varela, at the Hacienda Las Glorias restaurant on First Avenue in Cedar Rapids, Iowa.

3.  On or about November 12, 1996, in Carroll County, Arkansas, Varela-Arteaga married Cross, who was then also an employee of Hacienda Las Glorias.  Cross was then an unmarried resident of Cedar Rapids, Iowa.

4.  On or about December 3, 1996, nine illegal aliens were found at the Hacienda Las Glorias restaurant and were arrested by the Immigration and Naturalization Service. Varela-Arteaga and Beatriz Varela were arrested and allowed to depart the United States voluntarily.

5.  Varela-Arteaga departed from the United States to voluntarily return to Mexico.

6.  On or about December 10, 1996, Beatriz Varela and Becker were married in Carroll County, Arkansas.  Becker was an unmarried resident of Cedar Rapids, Iowa and an employee of the Hacienda Las Glorias restaurant.

7.  At some unknown time between December 6, 1996 and March 27, 1997, Varela-Arteaga unlawfully re-entered the United States.

8.  On or about March 27, 1997, Varela-Arteaga submitted an application to adjust his status from illegal alien to permanent resident alien status based upon his marriage to Cross.

9.  For tax years 1998 and 1999, Varela-Arteaga and Cross filed federal taxes jointly as husband and wife.

10.  For tax years 1998 and 1999, Varela-Arteaga and Cross reported to the Internal Revenue Service a joint

domicile of 1071 F Avenue NW, Cedar Rapids, Iowa.

11. During 1998 and 2000, Varela-Arteaga and Beatriz Varela resided together at 1071 F Avenue NW, Cedar Rapids, Iowa, with their children, Samuel, Karen and Luis.

12. On or about April 26, 2000, Varela-Arteaga's application to adjust his status from illegal alien to permanent resident alien based upon his marriage to Cross was approved.

13. On July 17, 2000, Varela-Arteaga and Cross were divorced in Linn County District Court, Linn County, Iowa.

14. On August 9, 2000, Varela-Arteaga closed on a newly-constructed house located at 4314 Roxbury Drive NW, Cedar Rapids, Iowa.

15. Between about August 9, 2000 and 2003, Beatriz Varela and Varela-Arteaga resided together at 4314 Roxbury Drive NW, Cedar Rapids, Iowa with their children.

16. On August 23, 2002, Becker and Beatriz Varela were divorced. Beatriz Varela's address was listed as 4314 Roxbury Drive NW, Cedar Rapids, Iowa.

17. On December 3, 2002, Beatriz Varela and Varela-Arteaga were remarried in Linn County, Iowa.

for the purpose of carrying out or carrying forward the agreement or understanding.

Final Jury Instr. No. 15; *see also* 8 U.S.C. § 1325(c); 18 U.S.C. § 371. The court further instructed the jury that the crime of marriage fraud has three essential elements,

as set forth in Part VI.A. *supra*.  Final Jury Instr. No. 14; *see also* 8 U.S.C. § 1325(c).

The defendants argue there is no evidence (i) Cross and Varela-Arteaga conspired to form an unlawful marriage to evade immigration laws; (ii) any persons reached an agreement or understanding to marry to evade the immigration laws; and (iii) Varela-Arteaga conspired with Beatriz Varela or Becker.  The government resists the defendants' arguments, citing extensive evidence in the record.

The court finds sufficient evidence was presented at trial for a reasonable jury to conclude the defendants conspired with Beatriz Varela and Becker to engage in marriage fraud for the purpose of evading the immigration laws.

Regarding the defendants' first two arguments, the court finds there was sufficient evidence of marriage fraud between Varela-Arteaga and Cross and there was an agreement to evade the marriage laws sufficient to sustain the defendants' convictions on Count 4.  As discussed in Part V. *supra*, "marriage fraud may be committed by one party to the marriage, or a person who arranged the marriage, yet the other spouse may genuinely intend to marry."  *Orellana-Blanco*, 294 F.3d at 1151. The court finds the evidence presented at trial proves Varela-Arteaga committed the crime of fraudulently marrying Cross with the purpose of evading the immigration laws, and Cross entered into an agreement with Varela-Arteaga to commit the crime. The government only needed to prove to the jury beyond a reasonable doubt that Varela-Arteaga sought to evade the immigration laws by fraudulently marrying Cross. Evidence was presented at trial of Varela-Arteaga's knowledge of United States immigration laws and his interests in adjusting illegal aliens' statuses such that they could lawfully work in the United States.  Varela-Arteaga was at risk of being deported, and was actually voluntarily returned to Mexico following the December 3, 1996 INS raid of a Cedar Rapids Hacienda.  From the evidence presented at trial, a

21

reasonable jury could find beyond a reasonable doubt that the marriage of Varela-Arteaga and Cross was entered into and was perpetuated to evade the immigration laws.

Even if Cross's intent in marrying Varela-Arteaga was initially legitimate, as Cross argues, the court finds she at least joined the conspiracy when she tacitly continued with the fraudulent marriage after moving to Arizona, moving in with another man, Harrelson, and having two children with Harrelson. In order to convict a person of conspiracy, "the government must show that the defendant entered into an agreement with at least one other person, the objective of which was unlawful, and that one of those in agreement committed an overt act in furtherance of the conspiracy." *Pardue*, 983 F.2d at 842. Cross attended the April 2000 meeting with an INS Officer to advance the government's adjusting Varela-Arteaga's immigration status even though Cross and Varela-Arteaga were no longer involved in a legitimate marriage. Cross did not inform the INS Officer she was living in Arizona with Harrelson and that she had two children with Harrelson while married to Varela-Arteaga. Furthermore, Cross misrepresented her residence information on Individual Income Tax Returns filed in 1998 and 1999. These overt acts furthered the conspiracy. This direct evidence, in addition to much circumstantial evidence, was sufficient for a reasonable jury to convict both Cross and Varela-Arteaga of conspiring to commit marriage fraud.

Furthermore, the court finds the defendants' third argument is meritless. The government presented sufficient evidence at trial to sustain the jury's findings regarding the overt acts furthering the fraudulent marriage between Becker and Beatriz Varela.[3] "Because the details of a conspiracy often are shrouded in secrecy, circumstantial

_____

[3] The following overt acts found by the jury to be committed by someone in furtherance of the conspiracy are relevant to the fraudulent marriage between Becker and Beatriz Varela: f. [6.], k. [11.], o. [15.], p. [16.], q. [17.].

evidence and inferences from the parties' actions may be used to establish the conspiracy's existence." *Mickelson*, 378 F.3d at 821. The dissolution of the marriage between Varela-Arteaga and Beatriz Varela in Mexico set the stage for each to move to the United States and enter into a fraudulent marriage for the purpose of evading immigration laws. Evidence proved Varela-Arteaga and Beatriz Varela had a continuous romantic relationship during the years of the conspiracy. Witnesses testified at trial that they knew Beatriz Varela as Varela-Arteaga's wife during the time period of the conspiracy, and that Varela-Arteaga and Beatriz Varela lived together openly as husband and wife during the time period of the conspiracy. Evidence proved while Cross and Becker were in a romantic relationship, each agreed to marry an illegal alien for the purpose of adjusting the illegal aliens' immigration statuses. Becker was an unmarried employee of a Cedar Rapids Hacienda known for being romantically involved and living with Cross prior to marrying Beatriz Varela. Becker and Beatriz Varela were married in the same obscure Arkansas county as Varela-Arteaga and Cross, one week later. Therefore, the court finds a reasonable jury could find beyond a reasonable doubt the defendants conspired with Becker and Beatriz Varela to enter into a fraudulent marriage to evade the immigration laws.

Viewing the evidence in the light most favorable to the government, as the court must, a reasonable jury could find the evidence proved beyond a reasonable doubt the defendants' guilt as to Count 4. The court does not find that a reasonable fact finder must have had a reasonable doubt as to the defendants' guilt as to Count 4. Accordingly, the court will not overturn the jury's verdicts as to Count 4 of the Second Superseding Indictment.

## VII. CONCLUSION

For the reasons stated above, the court **DENIES** Defendant Luis Armando

Varela-Arteaga's oral Motion for Judgment of Acquittal and his Memorandum re Motion for Judgment of Acquittal (docket no. 180) and Defendant Tiffany Marie Cross's Joinder to Memorandum re Motion for Judgment of Acquittal Pertaining to Count 4 (docket no. 182) and Motion for Judgment of Acquittal (docket no. 184).

**IT IS SO ORDERED.**

**DATED** this 16th of May, 2005.

LINDA R. READE
JUDGE, U. S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA